Understood. Thank you. Good afternoon. May I proceed, Your Honor? Thank you very much. Good afternoon. My name is Martin Aarons. I represent Jack Engel. I hope you and all your families are safe and healthy this time, and thank you for allowing us to appear via Zoom. I really appreciate it. So there are three main reasons why the trial court's granting of summary judgment should be reversed. The first reason is the lower court took the light most favorable to charter on all the issues. Whether there was evidence of his termination was due to his disability or his protected activity of taking leaves. If he was a qualified person with a disability, in other words, if he could have been accommodated, what his restrictions were, whether or not there was an interactive process, if he could have been accommodated, all of those issues were looked at and weighed, in fact, by the district court when there was a plethora of disputed material facts in dispute. Second, as to the discriminatory animus, the court ignored the direct evidence of discriminatory animus and then concluded that that direct evidence was also not even circumstantial evidence of pretext when there was both direct and circumstantial evidence towards Mr. Engel and earlier, I think I said Isaac. It's okay. It's reading your middle name. But now, so could you tell me what if you had to pick three items of evidence that you think show improper animus, but pick the most important two, what would those be? Well, the first thing I would point out, Your Honor, is that Armando Blancas, who was the decision maker on the termination, in fact, he was Jack's supervisor and signed, his name was on the corrective action notice, told Paul Bullard that all employees that are on leave are being terminated. And that's direct evidence of animus of determination. That's number one. Number two, the May 12th, 2017 letter was sent to Mr. Engel. Can you tell me where in the excerpts that is? Which, the May 12th letter or the Bullard quote? The first thing you're talking about, the supervisor saying all employees that are on leave should be terminated. Sure. That's at 7ER1111. It's paragraph eight of Mr. Bullard's declaration. Oh, paragraph nine. That's number one. Number two, just like the Supreme, just like the Court of Appeals in California case of Wallace talks about, if the reason for the termination was directly related to their disability, that's direct evidence of discrimination. Here, the May 12th letter that was sent to Mr. Engel said to him, the company is unable to hold your position because you're not able to return to work and do the essential functions of your job. You're out on a leave and you've got restrictions, and we're going to fire you in 21 days. That's direct evidence of discrimination. And number three, that's the reason. The third thing that I would point to is that the termination reason was the letter attached to corrective report, and it listed out not meeting your attendance. And the only note is that he failed to return to work from his leave. Well, he was on his leave due to his injuries. And if I got to have a fourth one, Your Honor, what I would say is when Mr. Engel talked to Donny Beverly, the workers' compensation analyst who was his contact, anytime that they would have calls, number one, they'd be initiated by Mr. Engel. And number two, Jack would say, look, I can be accommodated in the warehouse. I could be accommodated in customer service. I could be accommodated in a variety of ways. And Mr. Beverly's response was always, well, if you've got any restrictions, we can't bring you back to work. It was almost what was being told to Jack was, you have to be 100% healed in order to return to work. And so those are all direct evidence of discrimination, which is important because when there's direct evidence of discrimination, from all that evidence, a jury could reasonably conclude that it's more likely true than not true that his leave and his injury was why he was fired. And that's why summary judgment is improper. Even if this court concludes, and I won't concede, but even if this court concedes that that's not direct evidence, at the very least, it's substantial circumstantial evidence to indicate, in fact, that there was a discriminatory animus and that his injury and his leave was the substantial motivating reason for his termination. And then the standard here, I don't have to prove that that's factually correct. It's just whether or not our jury could find that way. And from here, not only is there that direct evidence, but there's the other circumstantial evidence, such as the comments of, we need to get... Can I just make sure I'm clear? If you have somebody who's injured and they're not capable, because you said earlier, you could conclude, a jury could conclude that his injury and his leave was the reason that he was terminated, right? I mean, if you have somebody who's injured and they're injured in such a way that they can't actually return to work, you can't accommodate them, I'm not saying that's your client, but if you did, I mean, you could terminate them if they're not capable of coming back to work. Correct. That is correct, Your Honor. But Justice Van Dyke, I think what you point out is the important part is that you have to have that interactive process and you have to discuss and determine if there are reasonable accommodations. And that was never done. I guess that's the reason I asked that question. If we just say, well, he was, I mean, I think it's clear that he was injured and that he was terminated. I don't know that your opponent would argue with you that he was terminated because of his injury in a sense, right? Which sounds terrible, but it's also sort of true. If somebody's injured bad enough and they can't be accommodated, then they can't be accommodated, they can't come back to work. And eventually they, you know, usually there's disability, leave and all this stuff, but then eventually you'll be terminated. But I think, so the issue comes down to the actual issues, if I understand correctly, are some of the stuff you're talking about, could he have been accommodated? Like that's, that's actually the issue. And some of the issues around the actual termination at the end there as to why. Right. So actually I think a respondent would say that we didn't fire him because he was on leave or because of all these other things. They try to distance themselves from that and say, it's because he didn't respond to a letter. And even that seems more at the, I guess, I'm getting more at the, I don't know they would say that they didn't terminate him because they didn't believe he could do his job. And then at the very end, when they gave the opportunity to respond, they said, well, he didn't respond, I guess. So sure. And I guess the question is whether or not he could do his job and the analysis that's there becomes, was there an interactive process, right? A communication between the employer and the employee, number one. And what about the reasonable accommodations? That's what I'd like you to talk about is, is, is do you, cause it seems to me your argument has to be, he could do his job. And it seemed to me like you're on stronger ground that he could do his job after he got the note. I forget the name of the doctor from the doctor saying that he could do most, most of the things, but that's after he was actually, if I remember right, the timeline, that's actually after he was terminated. So in your argument has to be that they had to have hired him back to talk a little bit more about at what point could he have done his job? So he could have been returned to work as of the summer of 2016, a year before he was fired, because at that point in time, his restrictions were just his job he did before, or are you saying one of these other jobs? Well, so is it both? Both is the answer to your question, because a DSR has different types of jobs that they can do, the direct sales representative. So could he have done the residential homes door to door? No, but there are other DSR jobs in big apartment buildings where one person is assigned to a huge apartment building. If he's just walking in hallways, interior hallways, and inside at a condo managers, he could do that. And his restriction was like, his restriction was not a preclusion on being outside. As Dr. Nick testified to in the notes say, he wanted him to work inside. He understood he'd be commuting to work. He'd have to get out of his car and go to places and drive around. It's that he wanted him to work inside. So could he have done different types of DSR job duties? Yes. Could he have done other inside jobs? Yes. But instead of acknowledging that his restrictions were just those limited things to work inside, what the defendant did and what the court adopted was take Mr. Angle's subjective like comments that he made to the doctors in the notes and transmute, take those comments into restrictions when in fact they weren't restrictions. So for example, the defendant tries to argue and the court adopts that he had a light restriction or a noise restriction, but A, that's not true. And B, those things could have been accommodated by wearing a baseball hat, sunglasses, changing the lights, putting on noise, canceling headphones. There was a innumerable ways he could have been accommodated. But what we saw is every time that there was a thought about accommodating him in the summer of 2017, when they even suggested a dispatch position that went nowhere, nobody even responded about the dispatch position. That's an admission that he could have done that dispatch job back in January of 2017 when there was a few emails between Beverly and Reed that was like, let's follow up on that. And then no follow up. And then in April of 17, the question was just, hey, have you guys done your interactive process? And the reason they wanted to know that is because they were going to start processing the termination. There was never any attempt to reach out to Jack, to talk to Jack, to talk to Dr. Nick, to do any type of interactive process because he could have done customer service jobs. As Mr. Bollard, who was his supervisor all the way up until right before he was fired in May of 17, says there were customer service jobs. He could have done them. He could have been accommodated. Jack even acknowledged he had training in customer service down in San Diego. He trained on the computer, so he knew how to do that. And so, could he have been accommodated? The answer to that question is yes. And not only is the answer to that question yes, but really the answer to the question here is, is that evidence enough to preclude some judgment? Like, could a jury infer that he could have done that job? Could a jury infer that he could have done the customer service job? And the answer is yes. So, like, there was information about restrictions, orthopedic restrictions. Well, in the evidence, there was an ADA form, which listed out, like, how often do you have to lift things? Frequently, never, rarely, sometimes, etc. When you match up the restrictions that respondent creates out of comments or out of Dr. Wood's report, they're not even essential functions of the job. So, it's a disputed fact as to whether it's an essential function. And then, as to the customer service rep job and the warehouse job, Charter doesn't even present that as evidence. So, we're left to speculate as to what those restrictions are, how they match up. But in actuality, Jack, who was a supervisor before and then stepped down, he was aware of what those things were. But, counsel, I understand at least part of your argument. You're saying the questions of whether he could do the work with reasonable accommodation should have been a question for the jury? A hundred percent, yes. For a fact issue for the court rather than summary judgment? Yes. But also, on the issue of whether there was an adequate interactive process, is that issue, like, a question for a trier fact? Yes. Is it a question that can be dealt with on summary judgment? I think that is also a question of fact, especially here when there is zero evidence of Charter ever interacting with Mr. Engel. And there's zero evidence of what internal discussions or evaluations they would have had. All there are are a few emails about, hey, have you done the interactive process? That was in May, April of 17. Or what are his restrictions? And if you recall the emails in January of 17, they had his restrictions wrong at that point in time. And so had they done an interactive process and reached out to him, they would have learned that. And every time that Mr. Engel reached out to Charter, he pointed out to them ways that he could do things. And the response he got back from Mr. Beverly was, well, if you have any restrictions, you know, until those are cleared, we can't accommodate you. I've run down on my time. I wanted to reserve a couple of minutes for rebuttal. So if there were not any more direct questions for me, I'd like to reserve the last. I'll give you a few extra minutes. But I have a question for you right now. Sure. On the interactive process issue, could you remind me what you think is the proper legal standard for assessing whether an interactive process has been done adequately? Sure. The cases talk about that you look for where is the breakdown in the interactive process and who caused that breakdown. And the person or entity who caused that breakdown is the person that is then or is responsible. And so can we, as a matter of law, determine based upon these undisputed facts that Charter didn't cause the breakdown? The answer is no. I think when you look at who caused the breakdown, well, there has to be. I'm not sure how you could have an interactive process that doesn't include the injured employee, which is essentially the position that Charter has taken here. The only way you could find as a matter of law that there talked to an employee about their restrictions and possible accommodation. Because other than Jack reaching out to them when their own internal emails show that they never followed through, they just continually let months go by. And on rebuttal, I'll give you the name of the case. Great. Okay. Thank you. And for your planning purposes, would three minutes of rebuttal work for you? Yes. Thank you very much. Your rebuttal will be not more than three minutes. Peterson, for your planning purposes, since I've let Mr. Aarons go over by three minutes plus, I'll just say, if you want an extra three minutes added to your clock, we'll do that right now. Thank you, Your Honor. Okay. Let's put three minutes extra on. Okay. Please proceed. May it please the court, Thomas Peterson on behalf of the Appalese. I'd like to start with this question of whether or not there is evidence of intent to discriminate in this case. And the problem with what he's... And let's start, because I think this is the best example with this statement in the Bullard Declaration at paragraph 9 ER 1111. And what he tries to draw, he tries to draw intent from a statement that is attributed to Mr. Armando Blancas, who says that employees that were on an injured list were being terminated from employment and that Jack's position would be filled. Now, let's, in order to understand why that's not direct evidence, laying aside from its other deficiencies, is direct evidence is evidence which has to prove the fact of discriminatory animus without inference or presumption. And I think what Judge Dike perhaps you were suggesting by your questions is, even if you view that statement as a suggestion that they are going to discharge injured people because they are injured, and that's not what it says, but even if you view it that way, the problem is that under California law, if someone is incapable of doing the job with or without restriction, or with or without accommodation, that person is not a qualified individual and unfortunately may be discharged under such circumstances. But there's other problems with the statement as well, which is we don't know that anyone else was injured. We don't know anything about this list or how one even got on the list or how many people would have been on the list. And in addition, it's important to think to remember as well that Mr. Bullard, who makes this statement, term ended his employment with my client more than a month before there was a discharge by the discharge of the plaintiff in this case, and that's in paragraph three of the declaration. With respect to the April 12th, Mr. Ahrens talks about the Wallace case. The Wallace case is the California Court of Appeal case that talks about how, you know, if you can find direct evidence whereby someone says, I am firing X because she is a woman, that statement establishes all you need for purposes of a violation without inference and that has nothing to do with this kind of a situation. And even if you attribute the statement as suggesting that people are being fired because they are injured because of peculiarity of California law and indeed federal law for that matter, with respect to the need to be qualified, you really can't draw that inference. And so that brings us then to the McDonnell-Douglas framework for purposes of determining whether or not there is a cause of action in this case. I'd like to go to this question. So there is the issue in this case of whether or not Mr. Engel was able and capable of performing without accommodation. Let's start by talking about accommodation because my friend Mr. Ahrens has suggested that there was no accommodation and there was a failure to engage in the interactive process. First, there was the ultimate accommodation from the very outset, which is leave of absence. That's a classic form of accommodation for people who have a disability. Now, and that went on for 87 weeks, substantially in excess of the maximum amount California requires in the way of leave, which is 12 weeks. I have a personal curiosity, I guess. Was he paid for that 87 weeks or was he paid for some portion? He received workers' compensation, Your Honor. That's right. So he was paid. Now, I don't know whether there was salary during part of the period as well, but he had a workers' compensation claim, which he was dealing with as well through the carrier. So he received compensation. I believe he settled his workers' compensation claim after he was discharged in 2018. All right, so let's then go back to the efforts at accommodating him. There are two letters he was sent on May the 12th. There is the letter, the 21-day letter, which refers to the fact that if you would like an accommodation, and if we don't hear from you by June the 2nd and you would like an accommodation, please send us the attached forms. And there's no question that he never sent back those forms. There is another letter of the same date, which also emphasized that he might have a desire to have an accommodation and asked specifically that if he wanted to have it, that he should ask his doctor to prepare and return certain forms by May 27th. That letter is found in the record at ER 835, and the 21-day letter is found at ER 536. So he was invited to get in touch and ask for further accommodation of some kind, and he didn't do it. So the idea there was no effort at accommodating, I mean, that certainly shows otherwise, and it's reasonable for an employer who has an employee, even under Mr. Aaron's definition of what is required for interactive process, I mean, that's just a failure to participate in it. But there was more. If you look at the timeline in this case, Mr. Aaron's, I'm sorry, Mr. Ingle did not become preliminarily available for any kind of work until approximately May of 2016, when Dr. Nick, his personal doctor, first suggested he could work and impose these limitations, quote, no sunlight, work in dim light, 15 plus pound lift restrictions. So those were the restrictions that were specified by his own doctor. Now Mr. Aaron says that Mr. Ingle, you know, had a different perception of his capacity and his ability to do various things, but the employer is entitled to rely on the advice that's provided by the doctor, particularly when it's the plaintiff's own doctor. Then there's a series of efforts that were made at accommodation. They start in June 30th of 2016, and now remember, he's still on leave, he's being accommodated. Now the question is whether he can be given some opportunity to come back to work. There, Mr. Knox raises with various people questions about whether or not there was a position he could find in the company. One of the problems in return to those inquiries, and we're talking now in the June through September 2016 period, is that jobs would require him to work outside, and his doctor, Dr. Nick, said there was to be no sunlight. In addition, then in January of 2017, the orthopedic doctor who examined him, Dr. Wood says, no repetitive movement at or above the shoulder level, no heavy work or repetitive squatting or one of the things Dr. Wood says is he's really not suitable to return to the position that he had held, which is the DSR position. That's what the doctor that examined him said. Despite that, he also, in terms of the interactive process, he testified that he talked with Mr. Beverly seven to ten times. Mr. Beverly was the principal contact at my client who was trying to work out an accommodation. Now, Mr. Aaron says that Mr. Beverly told the plaintiff that, well, unless you get out from under your restrictions, you can't come back. You have to look at it contextually, assuming we're crediting it. I'm not suggesting that it's necessarily how everyone would view what happened, but if we credit it given its summary judgment, you have to look at the other accommodation. Ms. Reese, who is the senior HR representative in the company, testifies in her declaration, which you'll find in volume two of the excerpt of record, that the company went through and considered several possible accommodations. They looked at the warehouse and found that the warehouse wasn't going to work because there was too much lifting and the like. One had to be able to lift up to 80 pounds, and it was necessary to do squatting and so on, which were among the things he was not permitted to do. The call center was considered as a possible location for accommodation, and as to that, the problem is that you heard, I read to you what Dr. Nick said, he's supposed to work in a dim light environment, and not only was that not a dim light environment, but he would have to be in front of a computer screen on a regular basis. So, there was ample evidence in this case of efforts at reasonable accommodation, and I'd like to then, and there's no dispute that those accommodations were offered. Now, I'd like to go back to Judge Gould's question, who inquired about, you know, what does the law require with respect to accommodation? It requires the plaintiff and the employer to be there. There's evidence here that there was interaction. There's really no disagreement about that, and insofar as Mr. Ingle called Mr. Bradley rather than the reverse, that's not relevant because the plaintiff himself has to be involved in the interactive process. The employer is not required to create a position. The employer is not required to consider promotion. One point in the briefs, it suggested that perhaps a promotion was possible. The California courts have repeatedly rejected that notion. The case that comes most readily to my mind is the Rainis case, which we've cited in the briefs, and the employer also is not required to accept or grant the desired accommodation that the employee happens to prefer. But here, you have a record where there was ongoing reasonable effort to try to accommodate in the circumstances of this case, and there's really no dispute about that in the context of the record that you have in front of you. So let me... Counsel, I have a question for you. Yes, Your Honor. On that issue, whether there was ongoing adequate efforts, is your position that there's no genuine issue or genuine disputed fact on that? Correct. That summary judgment was proper? That's correct, Your Honor, and the reason for that is not only that you look at the totality of the efforts that were undertaken, number one. Number two, you look at the particular job requirements of these positions that were other than the DSR position, and that was the job he had at the time of his injury. And remember, that's the position that Dr. Woods said he really couldn't go back to. And moreover, Mr. Ahrens had suggested that perhaps the record doesn't illuminate what those positions required. Well, if you look at Ms. Reese's declaration, you will find attached as Exhibits O and P, the job descriptions that were posted for the warehouse position and for the call center position. If you look at the letter sent on May 12, inviting and never getting a response, but inviting that there be the doctor send information that would assist the company in trying to figure out if there could be an accommodation, you'll see attached to that the job descriptions of the DSR position. And as you go through them, you'll see repeated instances where the evidence without contradiction, because we're talking about what the doctor said, the evidence shows that it would be reasonable for the employer to conclude that he couldn't be shifted over to one of those positions. And let's also, what may be an even easier way to deal with this as a matter of law is California law establishes that it's the plaintiff's obligation to show that there was an available position that the plaintiff could have filled. And Mr. Ingle testified, for example, that he didn't know of any open position in the warehouse department, which was one of the places he wanted to go. And I think you'll search the record in vain for showing that there was such a position. And with respect to the claim, there be a, you know, failure of the interactive process as distinguished from the failure to accommodate that requires under California law that there be a demonstration that some further interactive process would have yielded an accommodation, which would have taken care of the situation of the plaintiff. And there's no evidence of that in this case as well. So I think those things also contribute to making this a case that's suitable for summary judgment. So let's see, let me just take a quick look at my notes and see if I have anything else that I feel I should draw to your attention. I think not. I think I've covered the points that I'd like to share with you, though I'd be most happy to answer any questions if you have them. Let's see if Judge Owens has no questions. Judge Van, okay. No, I'm good. I have one question for you. Yes, your honor. It's just kind of a novel question. So probably never been decided explicitly. The question is this. I know we have some cases like in Title VII discrimination suits, for example, where our circuit precedent sets a very difficult standard to say there's no issue of fact and that we've said that certain kinds of issues normally should be resolved at trial if there's any dispute. And my question is, is there anything, any case that's examined that issue with regard to the interactive process question? Because I've seen like a parade of interactive process questions over decades, and it always seems to me there's not much that's involved in assessing whether parties are talking to each other and acting in good faith. Is there any case that sets a standard for when the matter can be handled by summary judgment or that elaborates on the factors that should be assessed? Your honor, I'm not aware of a Ninth Circuit case. And, of course, here we have to keep in mind we're actually dealing with California law. We did draw to your attention a couple of unpublished decisions of the courts of appeal, which, of course, under this court's precedent, you're allowed to look at insofar as you're trying to predict California law, which is your ultimate job in this kind of a case. And they gave you illustrations of how California courts of appeal have dealt with this. But Judge Gould, I think this case may not be one where it would be helpful as it would be to the bar generally. I'm not sure this is the case where the court needs to help guide us on how to deal with the difficult cases. Because I think when you have as here a complete failure to respond to two different letters inviting the interactive process after being on leave for what ended up being 87 weeks and after this evidence I have described to you, which is not disputed, that there were efforts made repeatedly at charter to find a when you have a failure on the part of the plaintiff to show what this position was that existed that he could have filled, I think those are fatal gaps to the plaintiff's case. And so it's not necessary here to write on the subject of, you know, when you have a back and forth, perhaps doctors disputing conclusions rather than just the plaintiff preferring something different, that you, you know, how does the court analyze that? That's very helpful. Thank you, Mr. Peterson. I appreciate it. Thank you, your honors. So I think Mr. Peterson's argument is concluded. And Mr. Ahrens? Thank you, your honor. To direct your attention on the interactive process, some case sites at pages 53 and 54 of our opening brief, we cite to the Weisinger matter and also to the Humphreys matter, but significantly at footnote 11 in the rain versus city of Burbank case, it noted that the question about whether or not there was an interactive process is generally one of fact and thus inappropriate summary judgment. And many of those cases, including the Scotch case that Mr. Peterson cited in their brief, talk about how those are typically factual issues. I wanted to address another couple of points. Uh, defendant points out and says, well, we could have just relied on the work restrictions on the doctor's notes. Well, that's not true. The California Supreme court in Guelph talked about how an employer cannot, and this is a quote, slavishly defer to the work restrictions without engaging in their active process or words to that effect. So in other words, they can't just look at the notes and then ignore the plaintiff. They still have to then reach out to the plaintiff as well and talk to the plaintiff. And so the idea that that the doctor's note in May, which was what you just don't hear, says no sunlight. I mean, that's what it actually says, right? No, it doesn't. So the main one. So, so the it says work inside building with no sun exposure. So you can work inside a building and not have sun exposure. You can close windows. And Dr. he could never be in the sun. It's that he didn't want him to work outside for consecutive hours. So that's Dr. Nick's deposition testimony that was taken by counsel for defending this case. And so had charter reached out to Dr. Nick during this time to get clarification as employers are allowed to do. And they already had a HIPAA form signed by Mr. argument that he needed, that they needed to reach out. It may sound, you know, it seems like if I was an employer and I got a thing saying this person can only work inside, I would think, okay, well, there must be some, maybe it's cold, maybe it's sun, whatever. I don't know, but they can't go outside. But then if it went further and said, you can only work inside with no sun exposure, I would think, wow, okay, this is a pretty significant doctor's note that they're not supposed to be in the sun. Are you saying they should have also had to get clarification from that, from the doctor? What I'm saying is if they were uncertain about what it takes into mind under California law, and there are cases that talk about that in California. And so what I'm saying is that here in this case, it's a disputed material fact about whether or not he could do the call center job, whether or not he could do the warehouse job. And in fact, I didn't get a chance to depose Ms. Reid because of the 13th hour issue. So her declaration about what they did with the warehouse, with a car center, and that, that wasn't, I wasn't given that opportunity. And I wanted to point out that while the DSR job, we have the ADA job description, that's it, 842 to 845. We don't have that same type of breakdown for the customer service job or the warehouse job because, so we don't know how frequently, even if those jobs are essential functions or not. And I think like the other thing he talks about, well, we don't know what that list is. Well, there's all those emails between Reid and Irway. And if you look at it, there's Excel spreadsheets and all the other names for privacy reasons are adapted. That's the list. That's the injured list. The last point I want to make is the Wallace case did not talk about how an employer is saying you're fired because you're a woman or because you're disabled. In that case, he had a... I just wanted to interject. We're substantially over the extended time. So I'm not going to be like former Chief Justice Gronquist was and stop someone in mid-sentence. But please try to conclude your argument in the completion of your sentence or one additional sentence. Yeah, but my completion of thought is that the Wallace case was actually similar to this case in that it dealt with a knee restriction. And they fired him because they said he couldn't do the essential functions of the job. And so I think because we've debated this ad nauseum and we could debate it ad nauseum, it just shows how there are numerous disputes of material fact that would require reversal of summary judgment and upon remand, the reopening of discovery. Thank you for engaging with both myself and Mr. Peterson and for humoring me as I went over. Our pleasure. And let me just say, I want to again commend and I'm sure that's on behalf of the full panel, the excellent arguments from Mr. Ahrens and Mr. Peterson. This case is a difficult one. And I realize each advocate thinks it's easy for their side, but from my perspective, maybe because of that, it's a difficult one. This case will be submitted and the parties will hear from us in due course. Thank you, Your Honors. Thank you, Your Honors.
judges: Gould, Owens, Vandyke